**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WOODCLIFF LAKE CITIZENS AGAINST OVERDEVELOPMENT, INC., | |
| *Plaintiff,* | Civil No.: 20-cv-16003 (KSH) (JSA) |
| v. | |
| BOROUGH OF WOODCLIFF LAKE; MAYOR AND COUNCIL OF THE BOROUGH OF WOODCLIFF LAKE, | **OPINION** |
| *Defendants.* | |

**Katharine S. Hayden, U.S.D.J.**

## I.      Introduction

In or around August 2020, Valley Chabad, Inc. and the Department of Justice reached a settlement with the borough of Woodcliff Lake resolving litigation under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA") initiated after Woodcliff Lake's zoning board denied Valley Chabad's application to construct a house of worship. The broad settlement was the product of lengthy negotiations with significant court involvement. In September 2020, the settlement was put into effect by way of municipal resolution at a meeting of the Woodcliff Lake's mayor and borough council and memorialized in consent decrees so-ordered by this Court.

Shortly after that, a citizen's group, Woodcliff Lake Citizens Against Overdevelopment, Inc. ("plaintiff"), filed the within lawsuit against the borough, mayor, and council ("defendants") challenging the settlement and seeking to restrain its enforcement on multiple grounds. Before the Court is defendants' motion (D.E. 7) to dismiss the complaint under Rule 12(b)(6), arguing

that plaintiff has failed to set forth any basis to invalidate or restrain enforcement of the settlement.  For the reasons that follow, defendants' motion is granted.

## II.     Background

### A.  The Original Lawsuit and Settlement

The facts are gleaned from the complaint (D.E. 1-1) and supplemented by the parties' submissions in connection with the instant motion (D.E. 7, 9, 13, 14), which were discussed at length during oral argument on February 2, 2022 (D.E. 23).

In October 2014, Valley Chabad filed an application before the Woodcliff Lake zoning board to construct a 12,247 square foot house of worship with ancillary uses at its property located at 100 Overlook Drive in Woodcliff Lake (the "premises"), a 1.27-acre lot in a residential district, where it had worshipped since 1996.  (Compl. ¶¶ 7, 9-10, 43.)  After the zoning board unanimously denied its application in August 2016, Valley Chabad sued the zoning board, the borough, and its mayor and property maintenance officer in this Court that November for violations of RLUIPA, the first and fourteenth amendments of the United States Constitution, and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-4 *et seq.*[1]  (*Id.* ¶¶ 11-12.)  In 2018 the Department of Justice filed its own lawsuit alleging RLUIPA violations, and the Court consolidated both actions on July 30, 2018.[2]  (*Id.* ¶¶ 13-14.)

After exchanging extensive written discovery, the parties engaged in nearly 18 months of settlement discussions, which included three conferences before the magistrate judge, Hon.

---

[1] The borough's zoning board, mayor, and property maintenance officer were subsequently dismissed from the original lawsuit.  (*See* D.E. 1-1, Consent Decree ¶ 7.)

[2] The consolidated actions are *Valley Chabad, Inc. et al v. Borough of Woodcliff Lake, New Jersey et al*, 2:16-cv-08087 and *United States of America v. Borough of Woodcliff Lake et al*, 2:18-cv-10511.

Joseph A. Dickson.  (D.E. 9, Gov't Stmt. of Int. at 2.)  The result was a comprehensive settlement agreement in each lawsuit that anticipated, upon approval by the borough's mayor and council, that the agreements would be memorialized in consent decrees and so-ordered by this Court (collectively, the "settlement").  (*See* Compl. ¶¶ 5-6.)

Pursuant to the terms of the private settlement (*i.e.*, Valley Chabad's lawsuit), the borough expressly denied any liability but agreed to make a $1.5 million payment to Valley Chabad.  (*See* D.E. 1-1, Settlement Agmt. 2-3, ¶ 1.)  Attached to the settlement agreement was a proposed site plan for the premises, which granted nine variances and five waivers so Valley Chabad could construct, subject to certain conditions, a 19,825 square foot facility with ancillary uses.[3]  (*Id.* ¶ 3, Ex. A; Compl. ¶ 7.)  In settling the DOJ action, the borough similarly denied any wrongdoing but agreed to comply with certain measures "meant to avoid future RLUIPA violations, such as the creation of a complaint procedure, regular reporting to the United States and to the Court, and RLUIPA training for [b]orough personnel."  (Gov't Stmt. of Int. at 3.)

### B.  Approval of the Settlement

Having reached a settlement, on August 6, 2020 the borough posted in the Bergen Record that it would be holding a mayor and council meeting on August 20.  (Compl. ¶ 16, Ex. B.)  On August 10, the borough posted notice of the August 20 meeting on its website, which included the meeting's date, time, and location.  (*Id.* ¶ 17, Ex. A.)  The notice further provided:

> **DUE TO THE COVID-19 VIRUS, THIS MEETING WILL BE A VIRTUAL MEETING AND THE PUBLIC WILL NOT BE ALLOWED TO ATTEND. YOU CAN WATCH THE MEETING LIVE.  IF YOU HAVE CABLEVISION, TUNE IN TO CHANNEL 77, AND IF YOU HAVE FIOS**

---

[3] For example, Valley Chabad agreed: (i) to comply with all requirements set forth by the New Jersey Turnpike Authority; (ii) to submit the site plan to the appropriate agencies, including the Turnpike Authority, as required by law; and (iii) that the borough engineer's approval of the site plan would be subject to successful completion of the New Jersey Department of Environmental Protection's soil testing.  (*See* Settlement Agmt. ¶ 3.)

> **TUNE IN TO CHANNEL 37.   DURING THE PUBLIC COMMENT SESSION, YOU MAY CALL IN AT [NUMBER].   PLEASE NOTE THAT ONLY ONE CALL CAN BE TAKEN AT A TIME.   YOU CAN EMAIL COMMENTS TO OUR BOROUGH CLERK UNTIL 12:00 P.M. ON AUGUST 18, 2020 AT [ADDRESS] AND YOUR COMMENT WILL BE PLACED INTO THE RECORD.**
>
> **THE PUBLIC WILL BE ABLE TO ACCESS THE MAYOR AND COUNCIL MEETING THROUGH ZOOM . . .**
>
> **WOODCLIFF LAKE, VALLEY CHABAD AND THE U.S. DEPARTMENT OF JUSTICE HAVE REACHED A SETTLEMENT IN PRINCIPLE . . .**
>
> **IN THE COMING WEEKS THE WOODCLIFF LAKE MAYOR AND MUNICIPAL COUNCIL WILL CONDUCT THE PUBLIC APPROVAL PROCESS AT WHICH TIME THE SETTLEMENT TERMS WILL BE ANNOUNCED AND INTERESTED PERSONS MAY BE HEARD.  UNTIL THEN, WOODCLIFF LAKE OFFICIALS DO NOT PLAN FURTHER COMMENT PENDING THE AUGUST 20, 2020 COUNCIL MEETING.**
>
> **ELECTRONIC COPIES OF THE PLANS ARE POSTED ON THE BOROUGH WEBSITE . . .  UPON REQUEST TO THE BOROUGH CLERK, HARD COPIES OF THE PLANS AND APPLICATION MATERIALS CAN ALSO BE SENT BY MAIL OR PICKED UP BY APPOINTMENT VIA PICK UP BOX.  A CHECK FOR PAYMENT OF THESE MATERIALS MUST BE MADE PRIOR TO PICK UP.**

(*Id.* Ex. A (emphases added).)

After the meeting was publicly announced, numerous residents emailed the mayor and council requesting that the approval process be postponed "so that a public in person meeting could be arranged in a larger venue to view the plans and review them with Borough professionals present."  (*Id.* ¶ 18.)  Although the virtual meeting occurred as scheduled on August 20, 2020, the mayor announced at its outset that the vote on the settlement would be postponed until the next meeting on September 14 to alleviate any concerns raised by the public.  (*Id.* ¶ 20; *see* D.E. 7-4, Pohlman Aff. at Ex. C.)

At the August 20 meeting, the borough's counsel explained the settlement terms and its engineer conducted a site plan presentation before opening the floor for public comment.  (*See*

Pohlman Aff. at Ex. C; *see also* D.E. 25, 2/2/22 Tr. at 67:2-16.)  Plaintiff alleges that residents were "unable to attend or witness" the meeting because the Zoom reached its maximum capacity of 100 participants, and those who viewed the meeting on cable television experienced audio issues and were unable to call into the meeting because the single phone line available was "constantly busy." (Compl. ¶ 21.)  After the meeting, approximately 500 residents signed a petition urging the mayor and council not to approve the settlement.  (*Id.* ¶ 22.)

On September 14, 2020, the mayor and council held a second virtual meeting, which lasted approximately three hours, to discuss and vote on the settlement.  (*See* Pohlman Aff. at Ex. D.)  After opening the floor for public comment, the mayor and council voted to approve the settlement by a 4-2 vote via two municipal resolutions.  (*Id.*; *see* Compl. ¶ 23, Ex. B.)  Plaintiff alleges that residents again experienced audio issues during the September 14 meeting and had difficulty calling in with public comment.  (Compl. ¶ 24.)

In the weeks that followed, the parties memorialized the terms of their settlement in consent decrees and presented them to the Court for approval.  (*Id.* ¶ 7.)  The Court so-ordered both on October 30, 2020.  (*See* Consent Decree at 11.)

### C.  The Instant Lawsuit

On October 29, 2020, plaintiff filed a two-count complaint in lieu of prerogative writs in state court, Bergen County, seeking to invalidate and restrain enforcement of the settlement on grounds that its adoption was a gross misapplication of RLUIPA and violated residents' due process rights in violation of the Open Public Meetings Act, N.J.S.A. 10:4-12, *et seq.* ("OPMA").  (*See* D.E. 1.)  Defendants removed the case to this Court on November 23 pursuant to the terms of the settlement.  (*Id.*; *see* Settlement Agmt. ¶ 6 ("[A]ny Complaint in Lieu of

Prerogative Writs . . . filed in any Division or venue of the Superior Court of New Jersey shall be promptly removed to the United States District Court for the District of New Jersey[.]").)

Defendants have now moved (D.E. 7) under Rule 12(b)(6) to dismiss the complaint, arguing that: (i) plaintiff should be precluded from bringing the instant lawsuit on standing and other constitutional grounds; and (ii) even if the lawsuit is properly here, plaintiff has failed to allege an OPMA violation or to otherwise present any facts that would justify interference with the original litigants' RLUIPA settlement.  (*See* D.E. 7-2, Mov. Br.; D.E. 14, Reply Br.)  The government has submitted a statement of interest (D.E. 9) in connection with the motion, urging the Court to find that no basis exists to enjoin enforcement of the settlement.

The Court held virtual oral argument on February 2, 2022.  (*See* D.E. 23.)

## III.   Discussion

### A.  Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept as true all allegations in the complaint, as well as all reasonable inferences that can be drawn therefrom. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The factual allegations in the complaint must be viewed in the most favorable light to the nonmovant.  *See Phillips v. County of Alleghany*, 515 F.3d 224, 231 (3d Cir. 2008).  To survive a motion to dismiss, a plaintiff must "plead more than the possibility of relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  The Court will "disregard legal conclusions and 'recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

Where, as here, "matters outside the pleadings are presented to and not excluded by the court," the motion generally "must be treated as one for summary judgment."  Fed. R. Civ. P. 12(d).  However, the Court may rely on documents that are "integral to or explicitly relied upon in the complaint" without converting the motion to dismiss into a motion for summary judgment. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425-26 (3d Cir. 1997) (internal citations and quotations omitted); *see also Moore v. Beers*, 121 F. Supp. 3d 425, 430 (D.N.J. 2015) (holding that a court "reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice," except where there is "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document") (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). Here, the Court will consider certain extraneous documents submitted by defendants—including, for example, the August 20 and September 14, 2020 meeting minutes filed with their moving brief (*see* Pohlman Aff., Exs. C, D)—as the parties have not disputed their authenticity in the papers or during oral argument, and they are integral to the allegations presented in the complaint.

## B.  Plaintiff's Challenge to the Settlement

The Court first addresses whether plaintiff seeks to challenge a municipal land use decision, or whether its challenge is more properly viewed as an attempt to invalidate a federal civil rights settlement reached within the confines of RLUIPA.  At first glance, plaintiff appears to frame its complaint as a challenge to the "approval by the Borough of Woodcliff Lake" of the settlement, because the site plan allegedly "circumvent[s] all local municipal zoning laws." (Compl. ¶¶ 4, 41.)  But the complaint is replete with references to RLUIPA and alleged

deprivations of residents' constitutional rights purportedly caused by defendants' approval of the settlement. (*See, e.g., id.* ¶ 50 ("[T]he adoption of the settlement agreements is a gross misapplication of RLUIPA and results in reverse discrimination towards the residents of Woodcliff Lake resulting in a deprivation and violation of life, liberty, property and due process of law").) During oral argument, plaintiff characterized the settlement as a "weaponization" or, at the very least, a "misapplication" of RLUIPA. (2/2/2022 Tr. at 39:2-6, 57:9-11.) Accordingly, attention to the statute, inelegant acronym notwithstanding, is in order

### a.  Religious Land Use and Institutionalized Persons Act ("RLUIPA")

RLUIPA (alternatively pronounced "ahrloopah" or "ruhloopah") is "the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burden, consistent with [Supreme Court] precedent." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 261 (3d Cir. 2007) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005)). RLUIPA addresses only land use regulations and the religious rights of institutionalized (incarcerated) persons. *See* 42 U.S.C. § 2000cc (land use) and § 2000cc-1 (institutionalized persons). Relevant here is the land use section, which prohibits governmental action that discriminates or results in unequal treatment on the basis of religion and that imposes a substantial burden on religious exercise. *See Congregation Anshei Roosevelt v. Plan. & Zoning Bd. of Borough of Roosevelt*, 338 F. App'x 214, 218 (3d Cir. 2009) (recognizing two-fold protections set forth in land-use section of RLUIPA). In pertinent part, the land use section provides as follows:

**(a) Substantial burdens**

**(1) General rule**

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person,

including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution –

        (A) is in furtherance of a compelling governmental interest; and

        (B) is the least restrictive means of furthering that compelling governmental interest.

**(2) Scope of application**

This subsection applies in any case in which –

. . .

        (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

**(b) Discrimination and exclusion**

**(1) Equal terms**

No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

**(2) Nondiscrimination**

No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

**(3) Exclusions and limits**

No government shall impose or implement a land use regulation that –

        (A) totally excludes religious assemblies from a jurisdiction; or

> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc(a), (b).

As the Supreme Court has recognized, "[s]everal provisions of RLUIPA underscore its expansive protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015). RLUIPA expressly directs that it is to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [its terms] and the Constitution." 42 U.S.C. § 2000cc-3(g). And Congress recognized that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c). Accordingly, RLUIPA includes a "safe harbor provision," which allows a government to "avoid the preemptive force" of the statute "by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden." *Id.* § 2000cc-3(e).

In the original lawsuits, Valley Chabad and the Department of Justice alleged that the borough's regulations and conduct violated both the substantial burden (§ 2000cc(a)) and discrimination and exclusion (§ 2000cc(b)) provisions of RLUIPA. In settling, the borough—without admitting liability—incurred expenses and altered specific zoning policies. That is consistent with RLUIPA in action: at times, the policies and practices of a municipality bend in favor of the broad protection of religious exercise. The statute's remedial goals have resulted in settlements in which municipalities have redressed identified harms caused by their land use policies, frequently to the dissatisfaction of residents otherwise benefitting from those policies. *See, e.g.*, *United States v. Maui County*, Civ. No. 03-00362 (D. Haw. 2003) (county settled

RLUIPA lawsuit by paying damages to plaintiff-church and permitting it to build house of worship that had been previously denied); *United States v. City of Lilburn*, Civ. No. 11-2871 (N.D. Ga. 2011) (federal court entered consent decree requiring city to allow Muslim group to construct mosque and to conduct future RLUIPA training and reporting); *United States v. Bernards Township*. Civ. No. 16-8700 (D.N.J. 2016) (township's RLUIPA settlement agreement required it to, among other things, approve application to build mosque that had been previously denied); *United States v. City of Farmersville*, Civ. No. 19-00285 (E.D. Tex. 2019) (city executed settlement agreement memorializing approval of Muslim congregation's previously-denied application to construct religious cemetery and commitment to engage in future training and reporting under RLUIPA).  The Court examines plaintiff's causes of action, therefore, satisfied that the complaint reflects the not unusual or unexpected reaction of local citizens protesting the impact of a successful RLUIPA lawsuit.  Indeed, as paragraphs 26 through 27 of the consent decree and paragraph 5 of the settlement provide, plaintiff is in this Court precisely because the parties anticipated such an action.[4]

### b.  Deprivation of Procedural Due Process in Violation of OPMA

In its first cause of action, plaintiff alleges that when defendants voted to approve the settlement terms reached in the RLUIPA litigation, they deprived residents of their procedural due process rights under the Open Public Meetings Act.

---

[4] Defendants raised lack of standing in their papers as a basis for dismissal.  That argument, which was not raised at oral argument, lacks merit as the parties expressly contemplated third-party challenges to the settlement.  (*See* Consent Decree ¶¶ 26-27 (providing for "direct or collateral legal challenges to, appeals from, or other litigation . . . filed by third parties") *and* Settlement Agmt. ¶ 5 (setting forth borough's defense of Valley Chabad in the event of any "direct or collateral legal challenges to, appeals from, or other litigation . . . filed by third parties")).

To establish a procedural due process violation, litigants must demonstrate "(1) that they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty and property, and (2) that the procedures available to them did not provide due process of law." *Lanin v. Borough of Tenafly*, 2014 WL 31350, at *4 (D.N.J. Jan. 2, 2014) (McNulty, J.) (quoting *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011)). Plaintiff's procedural due process claim is premised on alleged violations of OPMA, which codifies New Jersey's public policy "to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way[.]" N.J.S.A. 10:4-7. Under OPMA, a public body generally may not hold a meeting without first providing "adequate notice" to the public, which is defined as:

> [W]ritten advance notice of at least 48 hours, giving the time, date, location and, to the extent known, the agenda of any regular, special or rescheduled meeting, which notice shall accurately state whether formal action may or may not be taken and which shall be (1) prominently posted in at least one public place reserved for such or similar announcements, (2) mailed, telephoned, telegrammed, or hand delivered to at least two newspapers which newspapers shall be designated by the public body to receive such notices . . . and (3) filed with the clerk of the municipality[.]

N.J.S.A. 10:4-8(d). Additionally, OPMA provides that "all meetings of public bodies shall be open to the public at all times," but that nothing in the act is to be

> construed to limit the discretion of a public body to permit, prohibit, or regulate the active participation of the public at any meeting, except that a municipal governing body . . . shall be required to set aside a portion of every meeting . . . , the length of the portion to be determined by the municipal governing body . . . for public comment on any governmental . . . issue that a member of the public feels may be of concern to the residents of the municipality[.]

N.J.S.A. 10:4-12(a).

Of particular relevance here are recent amendments to OPMA, effective March 20, 2020, enacted in response to the COVID-19 pandemic. The amendments provide that during "a period

declared pursuant to the laws of this State as a state of emergency, public health emergency, or state of local disaster emergency," a public body is permitted to perform certain tasks "by means of communication or other electronic equipment," including: (i) conducting meetings; (ii) causing a meeting to be open to the public; (iii) voting; or (iv) receiving public comment. N.J.S.A. 10:4-9.3(a).  The amendments also permit a public body to "elect to provide electronic notice . . . in lieu of the adequate notice required" under N.J.S.A. 10:4-8(a), and clarify that the entity "shall not be deemed to have violated any provision of the law thereunder in providing such electronic notice."  N.J.S.A. 10:4-9.3(b).  If a public body chooses to provide "*only* electronic notice of a meeting*," it shall, "*[t]o the extent practicable*, . . . limit public business discussed or effectuated thereat to matters necessary for the continuing operation of government and which relate to the applicable emergency declaration."  *Id.* (emphases added).

Here, plaintiff has not specifically identified a life, liberty, or property interest, instead claiming that defendants sufficiently violated both the spirit and letter of OPMA during the August 20 and September 14, 2020 mayor and council meetings so as to establish a due process violation and invalidate the settlement.  (*See* 2/2/22 Tr. at 53:11-25.).  Plaintiff first alleges that defendants should not have held virtual meetings for a "highly controversial land use matter," and that doing so enabled them to "hid[e] behind the COVID-19 pandemic to shut the public out" from those meetings and "rush[] through the settlement" in violation of OPMA.[5]  (Compl. ¶¶ 25, 34; *see* 2/2/22 Tr. at 43:14-20.)

---

[5] The Court is aware of one other case where the plaintiffs attempted to make a similar argument regarding the purported secrecy of a meeting at which a RLUIPA settlement was discussed and voted on, albeit the case predates the COVID-19 pandemic.  In *Youkhanna v. City of Sterling Heights*, 332 F. Supp. 3d 1058, 1068 (E.D. Mich. 2018), *aff'd*, 934 F.3d 508 (6th Cir. 2019), a Michigan district court found that a mayor and its council did not violate Michigan's Open Meetings Act by removing audience members from an in-person meeting to discuss and vote on a controversial RLUIPA settlement that was reached with court involvement.  In rejecting the

A dispassionate reading of the amendments, however, shows that defendants observed OPMA in letter and in spirit.  The New Jersey legislature enacted the changes in response to COVID restrictions to ensure that public officials could continue to conduct meetings, hold them out to the public, receive public comment, and vote "by means of communication or other electronic equipment" during a period of public emergency.  *See* N.J.S.A. 10:4-9.3(a).  These defendants conducted the August 20 and September 14 meetings virtually; held them out to the public via Zoom and cable television; accepted public comment through multiple channels including Zoom, phone, and email; and voted to adopt the settlement virtually.  Significantly, the amendments apply across the board and make no exception for "highly controversial" matters or those that have a special impact.  (*See* Compl. ¶¶ 25, 34.)[6]  The Court thus finds no OPMA violation on these grounds.

Plaintiff next alleges that residents were unable to "attend or witness" the virtual meetings due to the Zoom capacity limit, audio issues with cable television, and other technological issues including "constantly busy phone lines."  (*See id.* ¶¶ 28-31.)  At argument,

---

plaintiffs' argument that the mayor and council "conducted its vote in secret," the court found that "the evidence before [it] show[ed] otherwise," citing the fact that the meeting was "streamed live on the City's website and YouTube channel and was broadcast live on cable television."  *Id.*

[6] Plaintiff also alleges that defendants "rushed the entire process" even though there was no "evidence that holding a vote on the matter at th[e] time was an emergency."  (Compl. ¶ 34.) But N.J.S.A. 10:4-9.3(a) does not require public bodies to come forward with "evidence" of the need to hold an "emergency" vote before conducting virtual meetings.  To the extent plaintiff is relying on N.J.S.A. 10:4-9.3(b) to support this allegation, such reliance is misguided.  N.J.S.A. 10:4-9.3(b) is a separate amendment that governs the use of electronic notice—not virtual meetings.  Even if N.J.S.A. 10:4-9.3(b) did apply, the amendment states that public bodies who provide only electronic notice of a public meeting shall "limit public business discussed or effectuated thereat to matters necessary for the continuing operation of government and which relate to the applicable emergency declaration," but only "*[t]o the extent practicable*."  N.J.S.A. 10:4-9.3(b) (emphasis added).

counsel for the borough acknowledged these limitations, even to the point of terming them "defects." (2/2/22 Tr. at 29:18.) However, to say this rises to the level of an OPMA violation sacrifices the good for the perfect. OPMA required defendants to hold the meetings "open to the public at all times," N.J.S.A. 10:4-12(a), and they did—the August 20 and September 14 meetings were held in full view of the public both on Zoom and on cable television for those unable to join the Zoom. Residents were notified that the meetings would be conducted virtually due to the COVID-19 pandemic and different technological avenues by which they could participate were explained. (*See* Compl. ¶ 17, Ex. A.) Plaintiff's allegation that technological issues prevented some residents from hearing the site plan presentation conducted by the borough's counsel and engineers and from viewing actual plans (*see id.* ¶ 31) are belied by references in the complaint that defendants posted the relevant site plans to the borough's website in advance and informed residents in their notices that they could view the plans on the borough's website or get electronic and paper copies from the borough clerk upon request. (*See id.* ¶ 17, Ex. A).

Elsewhere the complaint asserts that "questions at both meetings were held until the end of the meetings," defendants "selectively chose which questions to answer, evade or ignore," and "residents were strictly held to speak in three minutes or less" with no back-and-forth dialogue. (*Id.* ¶¶ 32, 38.) Noticeably absent from plaintiff's opposition brief, however, are any citations to case law or applicable provisions of OPMA which indicate that any of the above actions are unlawful.[7] To the contrary, OPMA grants public bodies the discretion to "permit, prohibit, or

---

[7] Plaintiff cites to N.J.S.A. 40A:12A-6(b)(4), which requires that a planning board "hear all persons who are interested in or would be affected by a determination that the delineated area is a redevelopment area," and that "[a]ll objections to such a determination and evidence in support of those objections . . . be received and considered and made part of the public record." The Court has reviewed all submissions and sees no indication that the relevant property involves a

regulate the active participation of the public at any meeting," requiring only that "a portion of every meeting" be set aside for public comment during meetings and, even then, public bodies have the discretion to determine "the length of th[at] portion."   N.J.S.A. 10:4-12(a).  As plaintiff recites in the complaint, defendants set aside time for public comment at both the August 20 and September 14 meetings, which is sufficient to comply with OPMA.  (Compl. ¶¶ 21, 24, Exs. A, B.)  Furthermore, plaintiff's allegation that defendants violated OPMA by not "reading" public comments submitted to the borough clerk via email into the public record is, as explained in defendants' moving brief, not supported by the law.  (*See* Compl. ¶ 33; *see also* Mov. Br. at 23-24.)  New Jersey law only requires that public comments submitted via email be maintained as a public record, which is precisely what defendants indicated in their notice.  (*See* Compl., Ex. A; *see also* N.J.S.A. 47:1A-1.1 (defining "government record" to include any paper, document, or information "stored or maintained electronically" that "has been received" by an officer in the course of his or her official duties).)[8]

Accepting the allegations in the complaint as true, plaintiff demonstrates certain imperfections or "defects" with the settlement approval process.  None, however, rises to the level of an OPMA violation or a constitutional deprivation of life, liberty, or property such that the first cause of action can survive this motion.  Accordingly, count one is dismissed.

---

"redevelopment area" such that N.J.S.A. 12A-6(b)(4) would apply to the instant motion.  *Cf. Zakon Realty, LLC v. Township of East Brunswick*, *et al.*, MID-L-732-21 (Law Div. 2021).

[8]  Plaintiff also takes issue with an email sent to residents by a party to the original lawsuit—Valley Chabad's rabbi—which was allegedly "highly inappropriate and indicated to the residents of Woodcliff Lake that **the Borough had already decided the outcome of the vote prior to the initial public hearing in violation of [OPMA.]**"  (Compl. ¶ 26.)  This is speculation; more to the point, the actions of an individual unrelated to defendants cannot form the basis of a viable OPMA claim against them.

### c.  Adoption of the Settlement was Arbitrary, Capricious, and Unreasonable

Plaintiff's second cause of action alleges that defendants' adoption of the settlement was arbitrary, capricious, and unreasonable.  Although there was some confusion during oral argument regarding where plaintiff obtained this standard (*see* 2/2/22 Tr. at 68:19-24), it appears plaintiff derives it from New Jersey Court Rule 4:69-1 through -7, which codifies the action it pursued in the instant lawsuit—an action in lieu of prerogative writs.  That Rule "creates a mechanism to challenge municipal decisions through a fast track procedure," and allows the trial court judge to "review[] the record and transcripts and determine[] whether the municipal body acted in an arbitrary, capricious or unreasonable manner."  *Casser v. Twp. of Knowlton*, 2018 WL 6069165, at *3 (D.N.J. Nov. 20, 2018) (Sheridan, J.), *aff'd,* 803 F. App'x 602 (3d Cir. 2020); *see Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 63 (3d Cir. 2013) (articulating arbitrary, capricious, or unreasonable standard applicable to actions in lieu of prerogative writs).  Application of this standard is akin to a deferential "rational basis" test.  *See Nat'l Amusements Inc.*, 716 F.3d at 63.  "Arbitrary and capricious . . . means willful and unreasoning action, without consideration and in disregard of circumstances."  *Id.* (quoting *Worthington v. Fauver*, 88 N.J. 183, 204 (1982)).  In other words, "[w]here there is room for two opinions, action is [valid] when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached."  *Id.* (quoting *Washington*, 88 N.J. at 204-05).

The "arbitrary, capricious, or unreasonable" standard applicable to actions in lieu of prerogative writs is similar to the deferential standard courts apply when reviewing the propriety of federal consent decrees, which the government brought to the Court's attention both in its statement of interest and during oral argument.  (*See* Gov't Stmt. of Int. at 2; *see also* 2/2/22 Tr.

at 73:22-74:3.)  Before approving a federal consent decree, the district court must ensure that it is fair—both procedurally and substantively, reasonable, and consistent with the law.  *See In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003).  Once approved, that decree is to remain undisturbed unless there is an "abuse of discretion."  *Id.* (citing *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 150 n. 8 (3d Cir. 1999)); *see United States v. New Jersey*, 522 F. App'x 167, 169 (3d Cir. 2013) ("Parties challenging a district court's decision to approve a consent decree bear a heavy burden.").

Here, plaintiff takes issue both with the process by which the settlement was reached (*see* Compl. ¶ 40) and with its substance (*see id.* ¶¶ 41, 44, 46-48.)  As to process, during oral argument, plaintiff characterized the settlement as a "rush to judgment."  (2/2/22 Tr. at 43:14-20.)  But the complaint recites facts demonstrating that the settlement was the product of literally years of consideration.  During oral argument, both defendants and the government referenced the extensive paper discovery the parties exchanged before they commenced settlement negotiations in earnest, some with the participation of the magistrate judge, over an 18-month period.  (*Id.* at 28:15-19, 75:16-76:3.)  Once the parties reached a settlement in principle, defendants posted the site plans to the borough's website and hosted two virtual meetings, which ranged from two-and-a-half to three hours each, that were held open to the public on Zoom and cable television.  (*Id.* at 7:2-15, 10:14-18.)  During those meetings, the borough's counsel conducted "long recitations" of "why th[e] settlement was approved," which included an explanation of the original lawsuit, its merits, and the "pros" and "cons" of settling without admission of wrongdoing.  (*Id.* at 33:3-34:1.)  The site plan was discussed at length by the borough's counsel and engineer, and residents were permitted to ask questions and voice their

18

Error

objections before the matter was called to a vote.  (*Id.* at 67:6-13, 69:6-26, 72:2-9.)[9]  In short, these processes, though admittedly imperfect (*id.* at 29:18), cannot be fairly characterized as a "rush to judgment."

Turning to the settlement's substance, plaintiff is correct that the borough granted Valley Chabad a number of variances and waivers in connection with the settlement.  But those variances were analyzed and approved not just by the mayor and council, but also by the borough's engineer who determined that they were "not overly burdensome to Woodcliff Lake." (2/2/22 Tr. at 33:12-16.)  Contrary to plaintiff's attorney's characterization that Valley Chabad was given a free pass to "ignore[]" zoning rules and regulations or to entirely "throw them out the window" (*id.* at 39:23-40:21), the settlement is replete with borough code compliance requirements, including those governing (i) the construction of fire lanes, parking lots, and drive aisles (Settlement Agmt. ¶ 3(a)); (ii) the placement of the rooftop deck (*id.* ¶ 3(c)); (iii) the height of the proposed structure (*id.* ¶ 3(d)); and (iv) the placement of certain retaining walls (*id.* ¶ 3(e)).  Furthermore, the settlement sets forth a number of hurdles Valley Chabad must overcome before it can break ground on the premises.  Among other things, Valley Chabad must (i) undertake soil testing required by the New Jersey Department of Environmental Protection, the results of which could impact approval of its storm water management plan (*id.* ¶ 3(f)); (ii) provide the borough with traffic and pedestrian safety plans (*id.* ¶ 3(h)); (iii) comply with New Jersey Turnpike Authority requirements (*id.* ¶ 3(i)); (iv) submit its site plan and all "other required plans, reports, [and] studies" to the appropriate agencies for further required approvals, including the Turnpike Authority (*id.* ¶ 3(l)); and (v) in the event the Turnpike Authority objects

---

[9] These representations were made during oral argument without dispute from plaintiff's counsel, who attended the August 20 and September 14 meetings.  (*See* Pohlman Aff., Ex. D; *see also* 2/2/22 Tr. at 10:19-23.)

to certain portions of its site plan, draft and submit a revised plan to both the Turnpike Authority and the borough (*id.* ¶ 3(n)). Given what the settlement demands, approval by the mayor and council was just the first of many steps that are still ahead.[10]

Finally, plaintiff alleges that the settlement poses an undue burden on residents and effectively results in "reverse discrimination." (Compl. ¶¶ 45, 50.) Plaintiff elaborated on this allegation during oral argument, explaining that there cannot be "an intervention" on the borough and its residents without a finding of "abridgement on free exercise or religion." (2/2/22 Tr. at 40:6, 57:9-58:21.) Besides lacking factual support, this argument misunderstands the context in which this litigation arose. As explained *supra*, Valley Chabad and the government commenced RLUIPA actions against the borough stemming from its zoning board's denial of a religious land use application, which resulted in a settlement. The purpose of that settlement, consistent with RLUIPA's remedial purpose and effect, was to prevent discrimination against Valley Chabad and to alleviate any substantial burden on its religious exercise. Any purported "burden" on the borough and its residents is an inevitable consequence of resolving RLUIPA litigation, which Congress anticipated when drafting the statute and requiring its remedial construction.

In sum, the Court finds that the complaint is bereft of any allegation which, if true, would demonstrate arbitrary, capricious, or unreasonable conduct on the part of defendants. Plaintiff's second cause of action is dismissed.

---

[10] When the Court asked, counsel indicated that actual construction has not begun. (2/2/22 Tr. at 35:22-36:10.)

**IV.**   **Conclusion**

For the foregoing reasons, defendants' motion to dismiss the complaint (D.E. 7) is

granted.  An appropriate order will issue.

/s/ Katharine S. Hayden
Date: March 24, 2022                                     Katharine S. Hayden, U.S.D.J.